**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| POSCO,<br><br>Plaintiff,<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor,<br><br>and<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | **NON-CONFIDENTIAL VERSION**<br>Proprietary Information Removed from Pages 8-10, 12, 15, and 31<br><br>Ct. No. 26-03053 |

**PLAINTIFF POSCO'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff POSCO hereby moves for judgment on the agency record in this action. POSCO challenges the *Final Results* issued by the U.S. Department of Commerce ("Commerce") in *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 27,264 (Dep't Commerce May 14, 2026) ("*Final Results*") in the following respects: (1) Commerce's determination that the Government of Korea's provision of electricity for less than adequate remuneration was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) is unsupported by substantial evidence and otherwise not in accordance with law; (2) Commerce determination to cumulate the entirety of the countervailable subsidy

rate received by POSCO's trading company, POSCO International, for selling electricity for more than adequate remuneration ("MTAR") with the rate of POSCO is unsupported by substantial evidence and is otherwise not in accordance with law pursuant to 19 U.S.C. § 1671(a); and (3) Commerce's decision to select a non-market-determined benchmark to calculate the benefit for the electricity for MTAR program is unsupported by substantial evidence and is otherwise not in accordance with law. The legal and factual grounds for Plaintiff's motion are set forth in the brief accompanying this motion. A proposed order is also attached.

WHEREFORE, Plaintiff respectfully requests that this Court grant this motion and (1) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (2) remand the case to Commerce with instructions to correct the errors identified by the Court; and (3) grant such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey
Xi (Jack) Yang

**TAFT STETTINIUS & HOLLISTER, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff POSCO*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| POSCO,<br><br>Plaintiff,<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | Ct. No. 26-03053 |

**ORDER**

Upon consideration of Plaintiff POSCO's Rule 56.2 Motion for Judgment on the Agency Record, and all other pertinent papers, it is hereby:

**ORDERED** that Plaintiff's motion is granted; and it is further

**ORDERED** that the *Final Results* that the U.S. Department of Commerce ("Commerce") issued in *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 27,264 (Dep't Commerce May 14, 2026) ("*Final Results*") are unsupported by substantial evidence and otherwise not in accordance with law; and it is further

**ORDERED** that the *Final Results* are hereby remanded to Commerce for reconsideration in accordance with the Court's opinion in this matter.

**SO ORDERED**.

___________________________________
Jane A. Restani, Judge

Dated: ____________________________
New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| POSCO,<br><br>Plaintiff,<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | **NON-CONFIDENTIAL VERSION**<br>Proprietary Information Removed from Pages 8-10, 12, 15, and 31<br><br>Ct. No. 26-03053 |

**PLAINTIFF POSCO'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**


Brady W. Mills
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey
Xi (Jack) Yang

**TAFT STETTINIUS & HOLLISTER, LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff POSCO*


November 23, 2026

# TABLE OF CONTENTS


I. Statement Pursuant to Rule 56.2 .......... 1

II. Issues of Law Presented and Reasons for Contesting the Administrative Determination.. 2

III. Statement of Facts .......... 3

IV. Summary of Argument .......... 12

V. Standard of Review .......... 16

VI. Argument .......... 16

A. Commerce's Determination that the GOK's Provision of Electricity for LTAR Is De Facto Specific Is Unsupported by Substantial Evidence and Is Otherwise Contrary to Law. .......... 16

1. Commerce Has Failed to Show that the Steel Industry Consumed A Disproportionately Large Amount of the Subsidy Pursuant to Section 771(5A)(D)(iii)(III). .......... 17

2. Commerce's Determination to Group Certain Industries for Purposes of Its Disproportionality Analysis Is Unreasonable. .......... 24

B. Commerce's Determination to Cumulate the Entire Subsidy Rate Calculated For POSCO International Under the Electricity for MTAR Program With POSCO's Subsidy Rate Is Unsupported by Substantial Evidence and Is Otherwise Contrary to Law. .......... 26

1. Commerce Failed to Show that the Subsidy Was with Respect to the Manufacture, Production, or Export of the Subject Merchandise as Required by 19 U.S.C. § 1671(a)(1). .......... 27

2. Even if Commerce Could Lawfully Attribute the Subsidy Received by POSCO International for its Sale of Electricity for MTAR to POSCO, Commerce's Failed To Adequately Explain Why Its Cumulation Method Did Not Overstate the Benefit That POSCO Received from Exporting Its Subject Merchandise to the United States Through POSCO International. .......... 31

3. Commerce's Use of a Non-Market-Determined Benchmark to Calculate the Benefit for Selling Electricity for MTAR Is Unsupported by Substantial Evidence and Otherwise Contrary to Law Because Commerce Failed to Assess the Adequacy of Remuneration in Relation to Prevailing Market Conditions and Overstated the Benefit Conferred. .......... 33

VII. Conclusion and Relief Requested .......... 38

Certificate of Compliance .......... 39

Certificate of Service .......... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acproducts, Inc. v. United States*,
829 F. Supp. 3d 1331 (Ct. Int'l Trade 2026) ....................16

*Am. Mfrs. Of Multilayered Wood Flooring v. United States*,
639 F. Supp. 3d 1216 (Ct. Int'l Trade 2023) ....................32

*Baroque Timber Indus. (Zhongshan) Co. v. United States*,
776 F. Supp. 3d 1290 (Ct. Int'l Trade 2025) ....................35

*Bethlehem Steel Corp. v. United States*,
140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ....................23

*Carlisle Tire & Rubber Co. v. United States*,
564 F. Supp. 834 (Ct. Int'l Trade 1983) ....................18, 19

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)....................32

*Delverde, SrL v. United States*,
202 F.3d 1360 (Fed. Cir. 2000)....................27

*Dorbest Ltd. v. United States*,
604 F.3d 1363 (Fed. Cir. 2010)....................29

*Fine Furniture (Shanghai) Ltd. v. United States*,
748 F.3d 1365 (Fed. Cir. 2014)....................12

*Hyundai Steel Co. v. United States*,
745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) .................... *passim*

*Hyundai Steel Co. v. United States*,
798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) .................... *passim*

*Hyundai Steel Co. v. United States*,
No. 24-00190, 2026 Ct. Intl. Trade LEXIS 125
(Ct. Int'l Trade Aug. 11, 2026) ....................23, 25, 26

*Kajaria Iron Castings Pvt. Ltd. v. United States*,
156 F.3d 1163 (Fed. Cir. 1998)....................36

*Mosaic Co. v. United States*,
589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022) ....................35, 37

*Mosaic Co. v. United States*,
659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ....................................................................34

*Mosaic Co. v. United States*,
774 F. Supp. 3d 1362 (Ct. Int'l Trade 2025) ..............................................................18, 19

*POSCO v. United States*,
794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) ............................................................ *passim*

*Ventura Coastal, LLC v. United States*,
736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024) ....................................................................16

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i).............................................................................................16

19 U.S.C. § 1671(a) ......................................................................................................... *passim*

19 U.S.C. § 1677(5) ...........................................................................................12, 34, 35

19 U.S.C. § 1677(5A) ....................................................................................................... *passim*

**Other Authorities**

19 C.F.R. § 351.511(a)(2)(i) ...............................................................................................34

19 C.F.R. § 351.512(a)(2*)*...................................................................................................34

19 C.F.R. § 351.525(c)...............................................................................................6, 26, 29, 31

*Certain Carbon and Alloy Steel Cut-to- Length Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2023*,
91 Fed. Reg. 27,264 (Dep't Commerce May 14, 2026) ............................................... *passim*

*Countervailing Duties*,
63 Fed. Reg. 65,348, 65,359 (Dep't Commerce 1998)........................................................34

Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"),
H.R. Rep. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. ...........................................18, 19, 24

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| POSCO,<br><br>Plaintiff,<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | **NON-CONFIDENTIAL VERSION**<br>Proprietary Information Removed from Pages 8-10, 12, 15, and 31<br><br>Ct. No. 26-03053 |

**PLAINTIFF POSCO'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with U.S. Court of International Trade ("USCIT") Rule 56.2, and the September 1, 2026, scheduling order, Plaintiff POSCO ("POSCO or Plaintiff") files this brief in support of its Rule 56.2 motion for judgment on the agency record. Scheduling Order, *POSCO v. United States*, No. 26-cv-3053-JAR (Ct. Int'l Trade 2026), ECF No. 28. As discussed herein, the U.S. Department of Commerce's ("Commerce") *Final Results* are unsupported by substantial evidence and are otherwise not in accordance with law.

*I. Statement Pursuant to Rule 56.2*

The administrative determination under review is Commerce's *Final Results* in the countervailing duty ("CVD") administrative review of certain carbon and alloy steel cut-to-

length plate ("CTL plate") from the Republic of Korea ("Korea"), which covered entries of subject merchandise into the United States between January 1, 2023 and December 31, 2023 (the "POR"). *See Certain Carbon and Alloy Steel Cut-to- Length Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 27,264 (Dep't Commerce May 14, 2026) ("*Final Results*"), PR 8, and accompanying Issues and Decision Mem. ("Final IDM"), PR 9.[1]

*II. Issues of Law Presented and Reasons for Contesting the Administrative Determination*

1. Whether Commerce's determination that the Government of Korea's ("GOK") provision of electricity for less than adequate remuneration ("LTAR") was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) is unsupported by substantial evidence and is otherwise not in accordance with law.

2. Whether Commerce's determination to cumulate the entirety of the countervailable subsidy rate calculated for POSCO International (an export trading company) from selling electricity to the GOK for more than adequate remuneration ("MTAR"), with the rate calculated for POSCO (the producer of the subject merchandise), is unsupported by substantial evidence and is otherwise not in accordance with law pursuant to 19 U.S.C. § 1671(a)(1).

3. Whether Commerce's calculation of the benefit for the electricity for MTAR program for POSCO and POSCO International using a non-market-determined benchmark is unsupported by substantial evidence and is otherwise not in accordance with law.

[1] The administrative record is contained in a confidential record ("CR") and a public record ("PR"). Administrative Record Index, ECF No. 25.

*III. Statement of Facts*

On July 5, 2024, Commerce initiated an administrative review of the CVD order on CTL plate for the 2023 POR. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 55,567 (Dep't Commerce July 5, 2024), PR 159. On July 26, 2024, Commerce selected POSCO as the sole mandatory respondent. *See* Mem. from Laurel Smalley and Faris Montgomery, International Trade Compliance Analysts, Office VIII, Antidumping and Countervailing Duty Operations to Katie Marksberry, Acting Director, Office VIII, Antidumping and Countervailing Duty Operations, "Countervailing Duty Administrative Review of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea; 2023: Respondent Selection" (July 26, 2024), PR 152.

Questionnaire Responses

On August 13, 2024, Commerce issued the initial questionnaire to the GOK and POSCO. *See* Letter from Katie Marksberry, Program Manager, AD/CVD Operations, Office VIII, "Administrative Review of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea; 2023: Countervailing Duty Questionnaire" (Aug. 13, 2024) ("Initial Questionnaire"), PR 150. On October 10, 2024, POSCO submitted its initial questionnaire response. Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Initial Questionnaire Resp." (Oct. 10, 2024) ("POSCO IQR"), CR 248–70, 305–42, PR 116–27. POSCO also submitted responses to the initial questionnaire on behalf of its affiliated export trading company, POSCO International, as well as various other affiliates whose responses are

not relevant to this appeal.[2] *See* Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO International's Initial Questionnaire Resp." (Oct. 10, 2024) ("POSCO International IQR"), CR 343–54, PR 114–15. On October 24, 2024, the GOK submitted its initial questionnaire response. *See* Letter from Bae, Kim & Lee LLC and Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: GOK's Initial Questionnaire Resp." (Oct. 24, 2024) ("GOK IQR"), CR 110–26, PR 94-103.

As part of the administrative review, Commerce examined numerous programs including, as relevant to this appeal, (1) the provision of electricity for LTAR, and (2) the provision of electricity for MTAR. *See* Initial Questionnaire at III-8–III-9.

*Electricity for LTAR*

For the provision of electricity for LTAR program, Commerce's benefit analysis focused on whether the Korea Electric Power Corporation's ("KEPCO") electricity prices were "consistent with market principles." *See* Final Decision Mem. at 17–22. Specifically, Commerce examined whether KEPCO fully recovered its costs and a reasonable rate of return. *See id.* To facilitate its benefit analysis, Commerce required the GOK to submit information regarding KEPCO's pricing methodology and its cost recovery data. *See* Initial Questionnaire at II-5–II-9. Commerce also requested that POSCO provide data on the rates it paid for its electricity purchased from KEPCO during the POR. *See id.* at III-8. In response, the GOK provided Commerce with detailed information regarding KEPCO's pricing methodology and cost

[2] These other affiliates include POSCO's holding company, POSCO Holdings, and its cross-owned input suppliers, POSCO Future M, POSCO M-Tech, POSCO Nippon Steel RHF Joint Venture Co., Ltd., and POSCO Mobility Solution.

recovery data. *See* GOK IQR at 20–24, 29–52. POSCO also submitted the requested data regarding the prices and quantities of electricity purchased by POSCO and its affiliates, including POSCO International, during the POR. *See, e.g.*, POSCO IQR at 37–39; *see also* POSCO International IQR at 31–32.

For the provision of electricity for LTAR program, Commerce's *de facto* specificity analysis focused on whether the steel industry in Korea received a disproportionate share of the electricity for LTAR subsidy. *See* Final IDM at 22–27. To facilitate this analysis, Commerce requested that the GOK submit information and data regarding the industries that consumed industrial electricity in Korea. *See* Initial Questionnaire at II-7. In its response to the initial questionnaire and the first supplemental questionnaire, the GOK provided confidential electricity usage data for the steel industry and the ten largest electricity-consuming industries for 2023. GOK IQR at 29; Letter from Bae, Kim & Lee LLC and Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: GOK's Supplemental Questionnaire Resp." (Aug. 4, 2025) ("GOK SQR"), CR 100-04, PR 75, at 11–15, Ex. E-25. The data showing the electricity usage by industry that the GOK provided were based on the Korea Standard Industrial Classification ("KSIC"), Korea's official industry classification system, and KEPCO's internal industry classification. GOK IQR at 29, GOK SQR at 13–14.

*Electricity for MTAR*

For the purchase of electricity for MTAR program, Commerce's benefit analysis uses the price of electricity purchased by the respondent company as the benchmark and compares that to the price of electricity sold by the respondent company. *See* Final IDM at 52. To facilitate this analysis, Commerce requested that POSCO and POSCO International report the prices and

quantities of their electricity purchases and sales during the POR. *See* Initial Questionnaire at III-8–III-9, III-16. In response, POSCO and POSCO International submitted data on the prices and quantities of their electricity purchases and sales during the POR. *See* POSCO IQR at 16–18, Ex. A-8, Ex. A-14; POSCO International IQR at 15, Ex. A-2, Ex. A-5. POSCO and POSCO International sold electricity to the Korea Power Exchange ("KPX"), which operates the market for electric power in Korea. *See id.* Regarding its electricity sales, POSCO International reported that while it did not own electricity generation facilities before January 1, 2023, the company began producing and selling electricity after acquiring POSCO Energy, which became POSCO International's Energy Business Unit. POSCO International IQR at 15. The Energy Business Unit's operations are unrelated to POSCO International's Global Business Unit, which exported the subject merchandise produced by POSCO to the United States. *Id.*

Because POSCO had exported subject merchandise to the United States through POSCO International, Commerce also requested that POSCO International submit information regarding the amount of POSCO-produced subject merchandise that was exported to the United States by POSCO International, as well as POSCO International's total sales. *See* Initial Questionnaire at III-2, III-6–III-7. In response, POSCO International submitted relevant data. POSCO International IQR at Ex. 7. This data was used by Commerce to determine how much of the subsidy rate calculated for POSCO International should be cumulated with the subsidy rate for POSCO under 19 C.F.R. § 351.525(c).

<u>Preliminary Results</u>

On September 11, 2025, Commerce issued its *Preliminary Results*. *See* Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2023, 90 Fed. Reg. 44,022 (Sept. 11,

2025) ("*Preliminary Results*"), PR 49, and accompanying Preliminary Decision Mem. ("Preliminary IDM"), PR 50. In the *Preliminary Results*, Commerce determined that the provision of electricity for LTAR program provided a financial contribution and benefit. Preliminary IDM at 27–35. Commerce also preliminarily determined that the provision of electricity was *de facto* specific because the steel industry allegedly "received a disproportionately large amount of the subsidy." *Id.* at 35 (citing 19 U.S.C. § 1677(5A)(D)(iii)(III)).

With respect to the benefit provided under the electricity for LTAR program, Commerce preliminarily determined that KEPCO provided electricity for LTAR because Commerce found that the rates at which KEPCO charged electricity did not allow it to recover costs plus a rate of return. Preliminary IDM at 34. To construct the benchmark for its benefit calculation, Commerce derived the specific percentages that KEPCO would need to increase its rates to recover costs plus a rate of return. *See* Mem. from Rachel Accorsi, Joshua Nixon, and Laurel Smalley, International Trade Compliance Analysts, to The File, "Preliminary Results Calculation Memorandum for POSCO" at 6–8 (Sep. 5, 2026) ("Preliminary Calculation Mem."), CR 53–54, PR 46–47. Commerce added the percentages it calculated to the actual prices that KEPCO charged for electricity. *Id.* Commerce then used the upward-adjusted electricity prices as the benchmark to calculate the benefit that POSCO, POSCO International, and certain of their affiliates obtained under the program. *Id.* Specifically, Commerce took the difference between the actual electricity rates paid and the upward-adjusted rates and multiplied that difference by the total kilowatt-hours of electricity consumed by these POSCO entities. *Id.*

For its electricity for LTAR specificity analysis, Commerce used both the KSIC and KEPCO data, which showed the percentage of electricity consumption by different industries in

Korea during the POR. Mem. from Rachel Accorsi, International Trade Compliance Analyst, AD/CVD Operations, Office VIII, "Countervailing Duty Administrative Review of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea; 2023: Specificity Analysis of Industrial Electricity Consumption" at 2 (Sept. 5, 2025) ("Electricity Specificity Mem.") CR 56, PR 48. Commerce preliminarily found that the provision of electricity for LTAR was *de facto* specific because it found that the steel industry received a disproportionately large amount of the subsidy. Preliminary IDM at 35. As support, Commerce relied on two different analyses – one that compared the steel industry's consumption of industrial electricity to the average level of industrial electricity consumption of the ten largest industries, and one that compared the consumption of the largest consumers of industrial electricity to the consumption of the smaller consumers. Electricity Specificity Mem. at 2–3.

The KSIC data, which reflects electricity consumption by different industries according to Korea's official industrial classification system, showed that the steel industry consumed **[ ] {GOK BPI}** percent of total industrial electricity in Korea. *See* GOK IQR at 29. The second dataset, the KEPCO data, which reflects electricity consumption by different industries according to KEPCO internal industry classification, showed that the steel industry consumed **[ ] {GOK BPI}** percent of total industrial electricity in Korea. *See* GOK SQR at 14. Commerce also found that the percentage of electricity consumed by the steel industry is **[ ] {GOK BPI}** percent higher than the average level of industrial electricity consumption of the ten largest industries under the KSIC data and **[ ] {GOK BPI}** percent higher under the KEPCO data. Electricity Specificity Mem. at 2–3.

Commerce also created an industry "grouping" that included the steel industry and the two to three largest electricity-consuming industries in Korea. Electricity Specificity Mem. at 3.

NON-CONFIDENTIAL

Using the KSIC data, the steel industry, along with the three largest electricity-consuming industries, consumed **[ ] {GOK BPI}** percent of the industrial class electricity, and the remaining six of the top ten industries consumed **[ ] {GOK BPI}** percent. *Id.* Using the KEPCO data, the steel industry, along with the two largest electricity-consuming industries, consumed **[ ] {GOK BPI}** percent of the industrial class electricity, and the remaining seven industries consumed **[ ] {GOK BPI}** percent. *Id.* Based on these two sets of comparisons, Commerce found that the steel industry received a disproportionately large amount of the subsidy. Preliminary IDM at 35.

With respect to the provision of electricity for MTAR program, Commerce preliminarily determined that the GOK provided a countervailable benefit to POSCO and POSCO International by purchasing the electricity generated by them for MTAR. *See* Preliminary IDM at 35–38. Commerce found a benefit existed because the rates the GOK paid for the electricity it purchased from POSCO and POSCO International exceeded the rates these companies paid the GOK for their purchase of electricity. *See id.* However, rather than using the upward-adjusted prices that it had deemed sufficiently increased to allow KEPCO to recover its costs plus a rate of return in its electricity for LTAR analysis, Commerce used the actual, unadjusted prices at which POSCO and POSCO International purchased electricity as the benchmark for the MTAR program. Preliminary Calculation Mem. at 8–9. To calculate the benefit, Commerce calculated the difference between the *unadjusted* price at which the companies purchased electricity (*i.e.*, the price that had been found to not be market-determined for purposes of the electricity for LTAR analysis) and the price at which they sold electricity, then multiplied that difference by the total kilowatt-hours of electricity sales they reported. *Id.* The use of this unadjusted purchase

price did not account for the fact that Commerce had already captured the benefit from this non-market-determined purchase price in its electricity for LTAR benefit calculation.

Once Commerce had calculated the company-specific subsidy rate from this electricity for MTAR program for POSCO and POSCO International, Commerce proceeded to cumulate the entire countervailable subsidy rate received by POSCO International to POSCO on the ground that POSCO had exported 100 percent of its subject merchandise to the United States during the POR through POSCO International. *See* Preliminary IDM at 10–11, 38. The subsidy rate for POSCO International from this program was **[ ]** percent, and the rate for POSCO was **[ ]** percent. *See* Preliminary Calculation Mem., Attachment 2 (Electricity Summary).

<u>Briefing</u>

On April 9, 2026, POSCO and the GOK submitted their case briefs. Letter from Taft Stettinius & Hollister LLP to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Case Brief" (Apr. 9, 2026) ("POSCO's Case Br."), CR 7, PR 15; *See* Letter from Bae, Kim & Lee LLC to Sec'y Commerce, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: GOK Case Brief" (Apr. 9, 2026) ("GOK's Case Br."), CR 5, PR 14. In their case briefs, POSCO and the GOK argued that Commerce's determination that the provision of electricity for LTAR program was *de facto* specific was unlawful because Commerce's comparison of the usage of the steel industry or the group of industries including the steel industry did not show disproportionality as that term is defined. *See* POSCO Case Br. at 5–15; GOK Case Br. at 16–26.

Regarding the provision of electricity for MTAR program, POSCO argued that under 19 U.S.C. § 1671(a) Commerce cannot lawfully cumulate the subsidy received by POSCO

International to POSCO because POSCO International is an export trading company and electricity sales do not relate to the manufacture, production, or export of the subject merchandise to the United States. *See* POSCO Case Br. at 17–24. Relatedly, POSCO and the GOK also argued that Commerce unlawfully used the rates at which POSCO and POSCO International purchased electricity from the GOK as the benchmark to calculate the program benefit because Commerce already found those rates inconsistent with market principles under the LTAR program and had already captured the benefit in its LTAR calculations. *See* POSCO Case Br. at 24–30; GOK Case Br. at 42–45.

Final Results

Commerce issued its *Final Results* on May 14, 2026. In the *Final Results,* Commerce continued to determine that the provision of electricity for LTAR was *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act. Final IDM at 22–27. To support its *de facto* specificity determination, Commerce continued to rely on both the KSIC and KEPCO usage data provided by the GOK for the steel industry and the top ten largest electricity-consuming industries, which reflected their consumption as a proportion of the total amount of electricity consumed in Korea and within the industrial classification. *Id.* The GOK datasets were proprietary, but Commerce found that both demonstrated that the steel industry and other industries combined consumed a disproportionately large amount of electricity in Korea. *Id.* (citing Electricity Specificity Mem. at 2–3 and Attachment). These were the same datasets and showed the same percentages as in the *Preliminary Results*, as discussed above.

Regarding the provision of electricity for MTAR program, Commerce continued to determine that it should cumulate the entirety of the countervailable subsidy rate received by POSCO International with the rate for POSCO. *See* Final IDM at 46–51; *See also* Mem. from

Rachel Accorsi and Joshua Nixon, International Trade Compliance Analysts, to The File, "Final Results Calculations for POSCO" at Attachment II (May 8, 2026) ("Final Calculation Mem."), CR 1–2, PR 6–7. Commerce's analysis continued to be based on the fact that POSCO had exported one hundred percent of its subject merchandise to the United States through POSCO International. *See id.* Also, Commerce continued to find that the appropriate methodology to calculate the benefit for the electricity for MTAR program is to compare the price at which POSCO and POSCO International sold electricity with the unadjusted price that they paid KEPCO for electricity. *See* Final IDM at 51–56. Due to Commerce correcting a formula error in its benefit calculations, the subsidy rate from this program for POSCO International was revised to **[ ]**%, while the benefit to POSCO remained at **[ ]**%. Final Calculation Mem., Attachment II (Electricity Summary Tab).

*IV. Summary of Argument*

Under the CVD law, a foreign producer like POSCO receives a countervailable subsidy if Commerce finds that "(1) a foreign government provide{d} a *financial contribution* (2) to a *specific* industry and (3) a recipient within the industry receive{d} a *benefit* as result of that contribution." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677(5)(B) (emphasis added); *see also* 19 U.S.C. § 1677(5)(A). This appeal relates to the specificity and benefit aspects of Commerce's review of two electricity programs. The first is the electricity for LTAR program, in which POSCO challenges Commerce's determination only with respect to the specificity element. The second is the electricity for MTAR program, in which POSCO challenges the benefit calculation and the cumulation of the entire subsidy rate calculated for POSCO's export trading company, POSCO International, with the subsidy rate calculated for POSCO from this program.

<u>Electricity for LTAR Specificity</u>

Commerce's determination that the GOK's provision of electricity for LTAR was *de facto* specific is unsupported by substantial evidence and is not in accordance with law.

A subsidy is *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) if the record shows that "an enterprise or industry receives a disproportionately large amount of the subsidy." In the *Final Results*, Commerce compared the total electricity use of several unrelated industries, including the steel industry, to the usage of smaller electricity consuming industries (grouping analysis), and also the steel industry's usage to the average usage of other industries (non-grouping analysis), to support the conclusion that the steel industry consumed a disproportionately large amount of electricity. By simply comparing the steel industry's consumption levels, or the group of industries' consumption levels, to the consumption level of other users, Commerce failed to give meaning to the statutory term "disproportionate." *POSCO v. United States*, 794 F. Supp. 3d 1402 at 1409 (Ct. Int'l Trade 2025) ("*POSCO I*") (disproportionality exists "'{w}hen something {has} too much or too little in relation to something else; not suitable in comparison with something in size, amount, importance, etc."). This Court has already rejected this type of comparative analysis of consumption levels between users, holding that Commerce "was required by the plain meaning of the statute to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage, not just the 'benefits {received by} others.'" *Id.* at 1410. For its group-based analysis, Commerce also failed to reasonably explain why it grouped together unrelated industries for purposes of its specificity determination. As this Court has found, the failure to reasonably explain the basis of the grouping renders the *de facto* specificity determination unsupported by substantial evidence and not in accordance with law. *See id.* at 1408 (declaring that "Commerce cannot use its

discretion to choose the largest consumers of a subsidy, group them together with no further explanation, and call it a reasonable choice").

Electricity for MTAR

Commerce's determination to cumulate the entirety of the subsidy rate it calculated for POSCO International from the electricity for MTAR program with the subsidy rate calculated for POSCO is unsupported by substantial evidence and is otherwise not in accordance with law.

The plain language of 19 U.S.C. § 1671(a)(1) provides that Commerce's investigation must focus on the provision of "a countervailable subsidy *with respect to* the *manufacture*, *production*, or *export* of a class or kind of merchandise imported, sold (or likely sold) for importation into the United States . . . ." (emphasis added). POSCO International is an export trading company, and its benefits could be cumulated with those received by POSCO only if any such subsidies to POSCO International were provided "with respect to" the manufacture, production, or export of POSCO's subject merchandise. They are not. It is undisputed that POSCO International is not a manufacturer or producer of the subject merchandise, and thus no subsidies it received are with respect to the production or manufacture of the subject merchandise. The record also shows that POSCO International's sale of electricity to the GOK is not with respect to the export of POSCO's subject merchandise. Indeed, it is hard to imagine a subsidy program that is less related to the export of subject merchandise to the United States since the MTAR program involves the sale of electricity to the grid in Korea. Because the electricity for MTAR subsidy received by POSCO International is not with respect to the manufacture, production, or export of POSCO's subject merchandise, Commerce's decision to cumulate the entirety of the subsidy rate calculated for POSCO International to POSCO is inconsistent with the statute.

But even if Commerce could, consistent with the plain language of the statute, cumulate some of the subsidy rate it calculated for POSCO International with the subsidy rate calculated for POSCO, Commerce's cumulation of the entire subsidy rate received by POSCO International to POSCO is unsupported by substantial evidence and is not in accordance with law. In calculating the ratio of POSCO International's subsidy rate to cumulate with POSCO, Commerce divided POSCO International's exports to the United States of the subject merchandise produced by POSCO (based on value) by POSCO's total exports of the subject merchandise to the United States. POSCO argued that this methodology overstated the subsidy because POSCO International's export of the subject merchandise produced by POSCO to the United States accounted for only **[ ]** percent of POSCO International's total sales during the POR. In the *Final Results*, Commerce failed to adequately address this argument or explain why this methodology was reasonable.

To add insult to injury, Commerce then proceeded to further overstate the benefit for the electricity for MTAR program. As discussed, Commerce's MTAR benefit calculation is based on the difference in the price that POSCO/POSCO International were paid for the sale of electricity to the GOK and the price that POSCO/POSCO International paid for purchasing electricity from the GOK. However, in this case Commerce found a subsidy from both the electricity for LTAR and MTAR programs. In the electricity for LTAR context, Commerce found that POSCO's and POSCO International's purchase price for electricity was not a market-determined price because the purchase price did not permit the GOK to recover costs and make a profit. For its LTAR analysis, Commerce thus constructed a cost-recovery benchmark price by adjusting the purchase price upwards to a price that would permit KEPCO to recover costs and make a profit and calculated the electricity for LTAR benefit based on the difference between

what POSCO and POSCO International actually paid and this adjusted electricity price. This method captured the electricity for LTAR benefit. Yet in the MTAR analysis, Commerce compared the price at which POSCO and POSCO International sold electricity to the *unadjusted* purchase price, even though it had been found not to reflect market rates for purposes of the LTAR analysis and even though the benefit had already been captured. If the Court finds that there is a lawful basis for Commerce to cumulate any of the electricity for MTAR subsidy rate received by POSCO International to POSCO, then Commerce must use the upward-adjusted electricity price as the benchmark for the electricity for MTAR program to comply with its regulations and the statute, and to avoid overstating the benefit.

## *V. Standard of Review*

In reviewing a challenge to Commerce's determination in a CVD administrative review, the court "shall hold unlawful any determination, finding or conclusion found… to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). When interpreting statutes, courts must exercise their independent judgment in deciding statutory meaning. *Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342, 1356 (Ct. Int'l Trade 2024) (citing *Loper Bright Enters. V. Raimondo*, 603 U.S. 369, 394 (2024)). Courts should not afford deference to the agency unless the regulation is genuinely ambiguous. *Acproducts, Inc. v. United States*, 829 F. Supp. 3d 1331, 1335 (Ct. Int'l Trade 2026) (citing *Kisor v. Wilkie*, 588 U.S. 558, 573–74 (2019)).

## *VI. Argument*

### *A. Commerce's Determination that the GOK's Provision of Electricity for LTAR Is De Facto Specific Is Unsupported by Substantial Evidence and Is Otherwise Contrary to Law.*

In the *Final Results*, Commerce found that the GOK's provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) because "the steel industry and two

(or three) other industries consumed a disproportionately larger amount of industrial class electricity in Korea, during the POR, in comparison to the other industries reported . . . ." Final IDM at 26. As support, Commerce relied on two comparisons using two different datasets. First, Commerce used data from KEPCO and the KSIC showing the amount of industrial-class electricity consumed by the top ten industries, including the steel industry. *See id*. at 24; Electricity Specificity Mem. at Attachment. Using these data, Commerce compared the consumption of a group of the top industrial electricity-consuming industries, including the steel industry, against the consumption of the other industries that consumed less industrial electricity. Final IDM at 25; Electricity Specificity Mem. at 2. Commerce found that there was an "appreciable difference" between the steel industry and the top two or three consumers of industrial electricity and the remaining industrial consumers in the datasets. Final IDM at 25. Second, Commerce also found that the steel industry received a disproportionately large amount of the subsidy because its consumption exceeded the average level of consumption by industrial-class electricity consumers in the KEPCO and KSIC datasets. *Id*. This *de facto* specificity determination is unsupported by substantial evidence and is otherwise contrary to law.

*1. Commerce Has Failed to Show that the Steel Industry Consumed A Disproportionately Large Amount of the Subsidy Pursuant to Section 771(5A)(D)(iii)(III).*

A subsidy can be found specific on a *de jure* or *de facto* basis. *See* 19 U.S.C. § 1677(5A)(D)(i) (*de jure*) & (5A)(D)(iii)(I)–(IV) (*de facto*). This case involves a *de facto* specificity determination. Final IDM at 22. The statute provides that a domestic subsidy is *de facto* specific if:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
> (II) An enterprise or industry is a predominant user of the subsidy.
> *(III) An enterprise or industry receives a disproportionately large amount of the subsidy*.
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii)(I)–(IV) (emphasis added). The statute also provides that "any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D). In evaluating whether a subsidy is *de facto* specific, Commerce must also consider the extent of diversification of economic activities in the country providing the subsidy. *See* 19 U.S.C. § 1677(5A)(D)(iii).

The Statement of Administrative Action ("SAA") distinguishes between subsidies that are "provided to or used by discrete segments of the economy" versus those that spread a benefit throughout the economy via widespread availability and use. Uruguay Round Agreements Act Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316 at 930, 1994 U.S.C.C.A.N. 4040, 4242 (Sept. 27, 1994). The SAA cites *Carlisle Tire & Rubber*, where the court explained that "all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results." SAA, 1994 U.S.C.C.A.N. at 4242 (citing *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834, 838 (Ct. Int'l Trade 1983)). As the *Mosaic* court explained, the SAA "cautions against… overreaching and indiscriminate" specificity determinations. *Mosaic Co. v. United States*, 774 F. Supp. 3d 1362, 1382 (Ct. Int'l Trade 2025).

The GOK's provision of electricity is exactly the type of widely used public program that is *not* intended to be countervailed because electricity is broadly available and used, and industrial users are subject to the same generally applicable KEPCO industrial tariff schedule

throughout the economy. *See* SAA, 1994 U.S.C.C.A.N. at 4242 (citing *Carlisle Tire & Rubber Co.*, 564 F. Supp. at 838); *Mosaic*, 774 F. Supp. 3d at 1382 ("Under the guiding principle addressed in the SAA, Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy and those… that distribute the benefit throughout the entire economy."). In citing favorably to *Carlisle Tire & Rubber*, the SAA recognizes that finding widely used programs such as these to be "specific" would produce absurd results. SAA, 1994 U.S.C.C.A.N. at 4242. Consistently, this Court found that " {s}ubsidized electricity is the type of 'widely used . . . public infrastructure' that countervailing duties will ordinarily not cover." *POSCO I*, 794 F. Supp. 3d at 1410–11. Record evidence in this case shows that electricity remains broadly available and widely used and is something that countervailing duties should generally not cover. Also, the electricity rates for industrial users such as the steel industry and the other sectors relied upon by Commerce to support its disproportionality decision are based on a standard pricing mechanism whereby no one company or industrial user receives a more preferential rate for electricity than other companies or industrial users. *See* GOK IQR at Ex. E-10 (showing that the same industrial electricity tariff rate is applicable to all electricity users involved in mining, manufacturing, and other business).

But even if a broadly available and widely used program like electricity can be specific, Commerce has not demonstrated that it is *de facto* specific in this case. Under 19 U.S.C. § 1677(5A)(D)(iii)(III), Commerce must determine that an enterprise or industry "receives a disproportionately large amount of the subsidy." According to the definition adopted by this Court, "{w}hen something is 'disproportionate' it '{has} too much or too little in relation to something else; not suitable in comparison with something else in size, amount, importance, etc.'" *POSCO I*, 794 F. Supp. 3d at 1409 (citing Black's Law Dictionary (12th ed. 2024));

*accord Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345, 1351 (Ct. Int'l Trade 2024) ("*Hyundai Steel I*")("disproportionate refers to 'having or showing a difference that is not fair, reasonable, or expected, and disproportionality exists when something is 'too large or too small in relation to something else.'"). In the *Final Results*, Commerce has failed to show that the percentage of electricity consumed by the steel industry, or the random group of the largest industries, is too much or too little in relation to something else in size, amount, or importance.

This Court's decision in *POSCO I* is directly on point. In that case, Commerce had grouped together the steel industry with two other industries and concluded that they had consumed a disproportionate amount of industrial electricity because the group consumed over half of the industrial electricity in Korea. *POSCO I*, 794 F. Supp. 3d at 1410. While recognizing that the subsidy was directly tied to how much electricity the industry uses (*i.e.*, it was usage-based), Commerce found that "disproportionate consumption of electricity compared to the average industry is enough to show disproportionate use of the subsidy, with no need to investigate if the subsidy received by the Korean steel industry does not align with its usage of electricity." *Id.* This Court found that "{s}ubsidized electricity is the type of 'widely used… public infrastructure' that countervailing duties will ordinarily not cover." *Id.* (citing *Gov't of Quebec v. United States*, 105 F.4th 1359, 1375 (Fed. Cir.)). This Court thus found that disproportionality, as that term is defined, must be shown to "'ensure{} that countervailing duties are not improperly levied against subsidies that are generally available and widely used across the economy.'" *Id.*

Also, since the electricity subsidy was directly tied to usage, this Court found that Commerce's reliance on the fact that the Korean steel industry uses a large amount of electricity to be insufficient to show disproportionality. *Id.* This Court held that Commerce:

> {W}as required by the plain meaning of the statute to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage, not just the 'benefits {received by} others . . . It is an obvious fact of life that 'virtually every' generally available and widely used subsidy – roads, bridges, schools, highways – will be used by, and therefore benefit, some industries more than others . . . Commerce's 'untenable' logic would lead to almost every generally available subsidy being de facto specific to every 'large company … merely because of the size of the company.' Commerce must show more to support a finding of disproportionate subsidy use.

*POSCO I*, 794 F. Supp. 3d at 1410 (citations omitted).

The *Hyundai Steel* decisions are also on point. In *Hyundai Steel I*, the court reviewed Commerce's *de facto* specificity determination whereby Commerce had simply grouped together the steel industry and three other industries and concluded that this group consumed a disproportionately large amount of industrial electricity. *See Hyundai Steel I*, 745 F. Supp. 3d at 1352 (citing 19 U.S.C. § 1677(5A)(D)(iii)(III)). In finding that Commerce's disproportionality determination was unsupported by substantial evidence, the court found it important that Commerce had grouped the industries together based on the amount of electricity consumed since the amount of the subsidy received was based on usage. *Id*. The court also noted that electricity prices are set using a standard pricing mechanism ensuring that no one company or industrial user receives a more preferential rate for electricity. *Id.* at 1352-53.

Given these circumstances where the subsidy amount is tied to usage and where no preferences are provided to any company or industrial user, the court found that Commerce's disproportionality determination:

> {E}lides the reality that programs designed to confer benefits on usage levels will necessarily result in larger users receiving a proportionally larger percentage of the subsidy . . . Disproportionality requires that an enterprise or industry is favored in some way (i.e., it receives more than its fair share). Commerce must explain how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator.

*Hyundai Steel I*, 745 F. Supp. 3d at 1353. The court also found that when analyzing disproportionality, “receipt of a greater monetary benefit from the program than others is not determinative of disproportionality.” *Id.* at 1351 (citing *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999)).

In *Hyundai Steel II*, the court reviewed several comparative analyses that Commerce used on remand to try to rehabilitate its specificity determination that are almost identical to the two comparisons that Commerce employed in the *Final Results* here. *See Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283, 1289 (Ct. Int’l Trade 2025) (“*Hyundai Steel II*”). More specifically, one of Commerce’s comparative analyses on remand showed that a group of industries consumed “a greater percentage of the industrial class electricity during the POR than other industries,” and another demonstrated that each industry that Commerce grouped together in that case individually consumed more electricity than the average amount of electricity consumed by the top industrial users. *See id.* at 1289. The court rejected both of these analyses, which it aptly characterized as a “more equates with disproportionate” type of analysis. *Id.* In doing so, the court reaffirmed the fundamental point that disproportionality “requires a comparison of the amount of subsidy and an attribute of the industry, not a comparison of the amount of a subsidy given to different industries.” *Id.* (citing *Hyundai Steel I*, 745 F. Supp. 3d at 1351–52; *AK Steel Corp.*, 192 F.3d at 1385; and *Royal Thai Gov’t v. United States*, 436 F.3d 1330, 1336 (Fed. Cir. 2006)).

Most recently, in *Hyundai Steel IV*, the court, following the reasoning in *POSCO I*, *Hyundai Steel I*, and *Hyundai Steel II*, again held Commerce’s *de facto* specificity determination was unlawful because the mere fact that the steel industry used relatively more electricity than certain other industries cannot establish that the steel industry consumed a “disproportionally

large" amount of electricity under 19 U.S.C. § 1677(5A)(D)(iii)(III). *See Hyundai Steel Co. v. United States*, No. 24-00190, 2026 Ct. Intl. Trade LEXIS 125, at *16 –18 (Ct. Int'l Trade Aug. 11, 2026) ("*Hyundai Steel IV*").

Consistent with this unbending line of cases, this Court should reject Commerce's *de facto* specificity determination because Commerce showed only that the steel industry consumed relatively more electricity than certain other industries, but it fell short of establishing disproportionality. Specifically, both of Commerce's comparison methods are based on a comparison of a group of industries or the steel industry's consumption of industrial electricity to the consumption levels of other users. *See* Electricity Specificity Mem. at 2–3. This type of analysis does not demonstrate disproportionality, as that term has been defined by the court, and instead only shows some disparity in electricity consumption between the steel industry (or the random group of industries) and the consumption of other smaller industries. *See Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1368-70 (Ct. Int'l Trade 2001) ("To impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws."). These comparisons do not show that the steel industry consumed more electricity than expected in relation to another reasonable comparator – a finding required to establish disproportionality.

To the extent that Commerce relies on Korea's economic diversification to determine that the provision of electricity for LTAR is disproportionately used, this reliance is misplaced. Final IDM at 23–25 (citing Mem. from Laurel Smalley, AD/CVD Operations, Office VIII, International Trade Compliance Analyst to The File, "Placement of Korea Economic Diversification Mem. on the Record" (Aug. 13, 2024), ("Economic Diversification Mem."), PR

148. While Commerce must take into account the extent of economic diversification, this criterion should "serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors." *See* SAA, 1994 U.S.C.C.A.N. at 4243. Here, Commerce fails to link its finding that the economy of Korea is diverse with its finding that a random group of industries consumes a disproportionately large amount of electricity. Additionally, while the Korean economy may span 19 different industry groupings, the data Commerce relies on also show that the number of establishments in each industry is not equal. For example, the number of manufacturing establishments (413,849) far outnumbers the number of establishments in 14 of these 19 industry groupings. Economic Diversification Mem. at Attachment. Many of the other industry groupings or establishments do not consume industrial-class electricity, including, for example, the food industry or wholesale and retail. *See id.*

*2. Commerce's Determination to Group Certain Industries for Purposes of Its Disproportionality Analysis Is Unreasonable.*

As discussed, one of the bases for Commerce's *de facto* specificity analysis involved the grouping of the steel industry with other large industries. *See* Electricity Specificity Mem. at 3. Commerce's reliance on an arbitrary grouping of the top consumers of industrial electricity to support its conclusion that this group, including the steel industry, consumed a disproportionate amount of industrial electricity is unlawful. Commerce fails to explain why it selected the top three or four industries—all of which are unrelated to each other—to determine that a "group" of industries received a disproportionately large amount of the subsidy. Instead, Commerce simply chose to aggregate the largest industrial industries together and its rationale for the grouping was that these industries consume "a relatively comparable percentage of total industrial electricity consumption." Final IDM at 25 (citing Electricity Specificity Mem.). This explanation is not reasonable and fails to adequately explain Commerce's choice to group these industries together.

This Court's decision in *POSCO I* is directly on point. In that case, this Court held that Commerce acted unreasonably when it grouped the Korean steel industry with two other unrelated industries because Commerce failed to consider the actual make-up of the firms. 794 F. Supp. 3d at 1408. The Court explained that Commerce is required to consider the actual make-up of the eligible firms when creating the group and provide a logical basis for why these industries should be grouped together, and its failure to do so renders its grouping decision unreasonable. *See POSCO I*, 794 F. Supp. 3d at 1408 (declaring that "Commerce cannot use its discretion to choose the largest consumers of a subsidy, group them together with no further explanation, and call it a reasonable choice"). Faced with the same unexplained grouping of industries, the *Hyundai Steel I* court explained that "{w}here a subsidy is widely distributed, Commerce cannot create a group to limit the subsidy for purposes of satisfying the specificity requirement without providing a rational basis for the grouping." 745 F. Supp. 3d at 1353. In *Hyundai Steel II*, the court also rejected Commerce's grouping of the largest consumers of industrial electricity: "Commerce simply grouped the top three industries together for its specificity analysis, but did not explain its reason for doing so beyond that the companies all consumed similar amounts of electricity." 798 F. Supp. 3d. at 1291. In *Hyundai Steel IV*, the court again held that Commerce's decision to group the steel industry with two other top electricity-consuming industries to assess whether that group consumed a disproportionate amount of electricity was unreasonable. *See* 2026 Ct. Intl. Trade LEXIS 125, at *19.

Consistent with these directly on point cases, this Court should reject Commerce's grouping analysis here because Commerce again fails to offer a reasonable explanation for grouping the steel industry with the other top electricity-consuming industries. In the *Final Results*, Commerce explained that it grouped the steel industry with the other two or three

highest electricity-consuming industries "based on a relatively comparable percentage of total industrial electricity consumption in Korea." *See* Final IDM at 25. This explanation cannot serve as a rational basis for Commerce's grouping decision because it neither identifies the types of firms included in Commerce's grouping nor offers any rationale beyond that the three industries all have high electricity consumption—an explanation the court has repeatedly rejected as insufficient to justify a grouping determination. *See POSCO I*, 794 F. Supp. 3d at 1408; *Hyundai Steel I*, 745 F. Supp. 3d at 1353; *Hyundai Steel II*, 798 F. Supp. 3d. at 1291; *Hyundai Steel IV*, 2026 Ct. Intl. Trade LEXIS 125, at *19.

*B. Commerce's Determination to Cumulate the Entire Subsidy Rate Calculated For POSCO International Under the Electricity for MTAR Program With POSCO's Subsidy Rate Is Unsupported by Substantial Evidence and Is Otherwise Contrary to Law.*

In the *Final Results*, Commerce calculated countervailable subsidy rates for POSCO, and the trading company that it used to export subject merchandise to the United States, POSCO International, by dividing the benefit that each company received for selling electricity for MTAR by the company's respective total freight-on-board ("FOB") sales. Final Calculation Mem. at Attachment II. This yielded a subsidy rate of 0.078% for POSCO and 2.827% for POSCO International. *Id.* (Electricity Summary Tab). Finding that since POSCO exported one hundred percent of its subject merchandise to the United States via POSCO International, Commerce cumulated the *entire* countervailable subsidy rate calculated for POSCO International with the subsidy rate calculated for POSCO. *Id.*; Final IDM at 51. This ballooned POSCO's total subsidy rate from this program from 0.078% to 2.91%, or by 3,631%, just because it exported subject merchandise via POSCO International. Commerce relied upon its trading company regulation at 19 C.F.R. § 351.525(c), and section 1671(a) to justify its cumulation of POSCO International's entire subsidy rate with POSCO's subsidy rate. Final IDM at 51. As

discussed below, this decision is unsupported by substantial evidence and is otherwise not in accordance with law.

1. *Commerce Failed to Show that the Subsidy Was with Respect to the Manufacture, Production, or Export of the Subject Merchandise as Required by 19 U.S.C. § 1671(a)(1).*

Under 19 U.S.C. § 1671(a), Commerce's review of subsidies must focus on the provision of "a countervailable subsidy *with respect to* the *manufacture, production, or export* of a class or kind of merchandise imported, or sold (or likely to be sold) for importation into the United States . . . ." (emphasis added). This statutory provision makes plain that the subsidy must be "with respect to" the manufacture, production, or export of the subject merchandise. *See Delverde, SRL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir. 2000) (holding that the statutory requirement under 19 U.S.C. § 1671(a) must be met before Commerce can impose countervailing duties); *see* Final IDM at 40 (acknowledging that Congress, through 19 U.S.C. § 1671(a), "directed Commerce to determine the extent of subsidization conferred upon the manufacture, production, or export of subject merchandise imported into the United States."). In this case, the subsidy calculated for POSCO International from the electricity for MTAR program plainly is not "with respect to the manufacture, production, or export" of the subject merchandise. There is thus no lawful basis to cumulate POSCO International's benefit from the electricity for MTAR program with the subsidy rate for POSCO.

The argument is straightforward. It is undisputed that POSCO International does not produce or manufacture the subject merchandise, and that POSCO is the only producer or manufacturer of the subject merchandise in this review. *See* Final IDM at 2. POSCO International is only subject to this review because it is a trading company involved in the *export* of POSCO's subject merchandise to the United States. *See id.* at 10–11. Therefore, it is plain

that any subsidies received by POSCO International are *not* "with respect to" the "production" or "manufacture" of the subject merchandise. The question under the statute is thus whether POSCO International received any subsidies "with respect to" the export of POSCO's subject merchandise that was imported into the United States. With respect to the electricity for MTAR program, the answer is plainly no.[3]

The sale of electricity is made exclusively through the KPX in Korea (Preliminary IDM at 28), and thus any subsidy received by POSCO International from the sale of electricity for MTAR through the KPX is not related to the export of POSCO's subject merchandise that is imported into the United States. Indeed, it is difficult to imagine a program that relates *less* to the exportation of subject merchandise that is imported into the United States. This program involves the sale of electricity by POSCO International to the electricity grid in Korea. There is simply no relation or nexus between a subsidy provided in connection with the sale of electricity in Korea and the exportation of subject merchandise to the United States.

If more were needed, the record also shows that POSCO International's sale of electricity through the KPX in Korea relates to its function as an electricity generation company via its Energy Business Unit. POSCO International IQR at 15. As reported in its questionnaire response, POSCO International only became involved in the sale of electricity after January 1, 2023, when it acquired POSCO Energy, which became POSCO International's Energy Business Unit. *Id.* This new Energy Business Unit has nothing to do with POSCO International's activities as an export trading company that exports POSCO's subject merchandise to the United

---

[3] Although POSCO firmly believes that *none* of the subsidies received by POSCO International are with respect to the manufacture, production, or export of subject merchandise, it has limited its argument to the electricity for the MTAR program, as this is by far the program that had the biggest impact on its subsidy rate.

States. Those activities are handled by the separate Global Business Unit. *Id.* This history and separation of the business units that deal with export activities and the sale of electricity further demonstrates that the sale of electricity is not "with respect to" the export of subject merchandise.

Accordingly, Commerce's cumulation of POSCO International's electricity for MTAR subsidy rate with the subsidy rate calculated for POSCO is contrary to 19 U.S.C. § 1671(a). Simply put, POSCO International's subsidy from its sale of electricity through the KPX in Korea for MTAR is not with respect to the manufacture, production, or export of POSCO's subject merchandise that was imported into the United States during the POR.

This statutory inconsistency is not saved by Commerce's reliance on its trading company regulation, 19 C.F.R. § 351.525(c). That regulation is very general and simply provides that benefits received by a trading company will be "cumulated" with the benefits provided to the producer of subject merchandise. But this general and broadly worded regulation must yield to the plain requirements of the statute. *See Dorbest Ltd. v. United States,* 604 F.3d 1363, 1371 (Fed. Cir. 2010) (Where, as here, "the intent of Congress is clear from the language used in a governing statute, neither the agency interpreting the statute nor this court may interpret the statute in such a way as to deviate from Congress's intent."). Plainly stated, if the subsidy to the trading company is not "with respect to" the manufacture, production, or export of subject merchandise then there is no legal basis to cumulate any of the trading company's subsidy with the subsidy received by the producer. The trading company regulation must be consistent with the statute. *See, e.g., id.* at 1371-72 (invalidating labor value regulation for failing to comply with the statute).

Commerce's claim that its trading company cumulation methodology is consistent with section 1671(a) is also without merit. *See* Final IDM at 47. According to Commerce, "{w}hen a producer exports subject merchandise to the United States, that merchandise can be subsidized both at the production stage based on the subsidies received by the producer and, if exported through a trading company, by the subsidies received by the trading company. This applies to all subsidization provided *to the company in question* . . . ." *Id.* at 47–48 (emphasis added). The italicized text reveals the error in Commerce's interpretation of section 1671(a). This statutory provision does not focus on the entities that engage in the activities (*i.e.*, the company in question), but rather focuses on the particular activity itself (*i.e.*, manufacture, production, or export). Had Congress intended for Commerce to focus on the entities that engage in the activities, it would have phrased the statutory language as requiring that the subsidy be with respect to a manufactur*er*, produc*er*, or export*er*. But it did not. Instead, the statute focuses on the activity itself and requires that it be "with respect to the manufacture, production, or export" of subject merchandise. Commerce misinterprets the statute by focusing on the fact that POSCO International is engaged in export activities and concluding that the statute requires it to cumulate *all* subsidies received by POSCO International simply because it is engaged in the export of POSCO's subject merchandise.

In sum, the subsidy calculated for POSCO International from the electricity for MTAR program plainly is not "with respect to the manufacture, production, or export" of the subject merchandise as required by 19 U.S.C. § 1671(a). Commerce's decision to cumulate the entirety of POSCO International's subsidy rate from the electricity for MTAR program with the subsidy rate for POSCO is thus unsupported by substantial evidence and is not in accordance with law.

2. *Even if Commerce Could Lawfully Attribute the Subsidy Received by POSCO International for its Sale of Electricity for MTAR to POSCO, Commerce's Failed To Adequately Explain Why Its Cumulation Method Did Not Overstate the Benefit That POSCO Received from Exporting Its Subject Merchandise to the United States Through POSCO International.*

In the *Final Results*, Commerce determined that "because POSCO International exported all the subject merchandise produced by POSCO that entered the United States, it is appropriate to apply a 100 percent ratio of attribution to the subsidy rates calculated for POSCO International as this ratio is in accordance with section 701(a) of the Act and 19 CFR 351.525(c)." Final IDM at 51. As discussed in section B. 1. above, there is no lawful basis to cumulate any of the subsidy rate calculated for POSCO International from the electricity for MTAR program with the subsidy rate calculated for POSCO. But even if it were lawful for Commerce to cumulate some of POSCO International's subsidy rate related to its sale of electricity for MTAR with POSCO's subsidy rate, Commerce failed to adequately explain why the cumulation of the entirety of that subsidy rate to POSCO did not result in the overstatement of the benefit.

In this case, POSCO International is a business conglomerate with a variety of operations, including selling electricity and exporting goods. POSCO International's export activities are handled by its Global Business Unit, which exports worldwide many types of products from many different companies. This is demonstrated by the fact that POSCO International's export of POSCO's subject merchandise to the United States accounts for only **[ ]** percent of POSCO International's total export sales and only **[ ]** percent of POSCO International's total sales. *See* Final Calculation Mem. at Attachment II, Tab "Sales." This data reflects that POSCO International's export of the subject merchandise produced by POSCO to the United States accounts for only a minuscule percentage of POSCO International's business.

Despite the limited amount of POSCO International's business that relates to its export of POSCO's subject merchandise, Commerce applied a methodology that resulted in the entirety of the subsidy rate calculated for POSCO International from the electricity for MTAR program being cumulated with POSCO's subsidy rate. POSCO argued in its case brief that this methodology resulted in the overstatement of any possible benefits that POSCO may have received from exporting its subject merchandise to the United States via POSCO International. POSCO Case Br. at 22-24. POSCO also argued that Commerce did not explain how the electricity for MTAR program was tied to the export of subject merchandise to the United States such that the numerator and denominator for the ratio calculation should be based on exports of subject merchandise to the United States. *See id.* In the *Final Results*, Commerce failed to adequately address these arguments or explain why its cumulation methodology was reasonable. Instead, Commerce simply stated that its practice applies the subsidization received by the trading company to the respondent based on the proportion of the trading company's business that is related to the export of subject merchandise. Final IDM at 51. Commerce additionally stated that it takes into account the diversity of the trading company's business by using its own sales as the denominator for determining the rate being cumulated. *See id.* This conclusory explanation is insufficient. *Am. Mfrs. Of Multilayered Wood Flooring v. United States*, 639 F. Supp. 3d 1216, 1232-33 (Ct. Int'l Trade 2023) ("Commerce has not offered an adequate explanation because conclusory statements are not sufficient to support, with substantial evidence, Commerce's decision."); *see also CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) ("Commerce has not provided the needed explanation setting forth the interpretations and evidence-based factual findings that establish the required connection from statute to determination.").

### 3. *Commerce's Use of a Non-Market-Determined Benchmark to Calculate the Benefit for Selling Electricity for MTAR Is Unsupported by Substantial Evidence and Otherwise Contrary to Law Because Commerce Failed to Assess the Adequacy of Remuneration in Relation to Prevailing Market Conditions and Overstated the Benefit Conferred.*

In the *Final Results*, Commerce calculated the benefits that POSCO and POSCO International received for selling electricity for MTAR by comparing the price at which the companies sold electricity to the GOK with the price at which they purchased electricity from it. Final IDM at 52. The problem with this method, however, is that Commerce already determined that the price at which the companies purchased electricity was not market-determined. *See id.* at 17 ("the prices of {the GOK's tariff schedule} were insufficient to recover costs plus a reasonable rate of return in the POR"). Using these prices that Commerce found not to be market determined prices as the benchmark to assess the adequacy of remuneration is inconsistent with the statute and regulations, which require a market-determined price as the benchmark for LTAR and MTAR programs.

Additionally, using these prices that Commerce found to not be market-determined as the benchmark overstates the electricity for MTAR benefit because Commerce already determined to countervail any benefits conferred from the electricity for LTAR program resulting from the companies' purchase of electricity at prices Commerce found were not market-determined. *See* Final IDM at 17. Specifically, Commerce adjusted the electricity price upward to a price that would allow the GOK to recover costs and a rate of return, then used that upward-adjusted price as the benchmark to calculate the benefit for the electricity LTAR program. *See id.* at 17–21. Use of the unadjusted purchase prices for purposes of the MTAR benefit calculation thus results in the overstatement of the benefits from the electricity for LTAR program, which are accounted for on both the LTAR and MTAR side.

*a. Commerce's Benchmark Selection Is Contrary to Law Because It Failed to Measure the Adequacy of Remuneration Against a Market-Determined Price as Required by 19 C.F.R. § 351.512(a)(2).*

Commerce's regulations governing the measurement of the adequacy of remuneration for LTAR and MTAR programs provide that "{t}he Secretary will normally seek to measure the adequacy of remuneration by comparing," for LTAR, "the government price to a *market-determined price* for the good or service" or, for MTAR, "the price paid to the firm for the good by the government to a *market-determined price* for the good." *Compare* 19 C.F.R. § 351.511(a)(2)(i) *with* 19 C.F.R. § 351.512(a)(2) (emphasis added). Commerce, in its *CVD Preamble*, also explained that it should measure the adequacy of remuneration for MTAR and LTAR programs under the "same basic principle, *i.e.*, will focus on what a market-determined price for the good in question would be." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,359 (Dep't Commerce 1998). Thus, Commerce's regulations for both the LTAR and MTAR programs require it to use a market-determined price for the good purchased or sold as the benchmark to evaluate the adequacy of remuneration. Yet in the *Final Results*, Commerce unlawfully applied the unadjusted electricity price, which Commerce determined to be non-market-determined in the electricity LTAR program, as the benchmark to calculate the benefit for the electricity for MTAR program. Final IDM at 17–21, 52. This Court should find that Commerce's use of non-market price as the benchmark to calculate the benefit received from selling electricity for MTAR is inconsistent with Commerce's own regulations and thus not in accordance with law.

Additionally, Commerce's use of these unadjusted non-market prices as the benchmark for the MTAR benefit calculation is inconsistent with 19 U.S.C. § 1677(5)(E)(iv), which requires Commerce to determine the adequacy of the remuneration "in relation to prevailing market

conditions." In the *Final Results*, Commerce failed to determine the adequacy of the remuneration for the electricity program in relation to prevailing market conditions when it used the unadjusted electricity price as the benchmark because Commerce itself has found this benchmark price to be non-market-determined in the electricity for LTAR context, as the price was affected by the GOK's alleged failure to incorporate an upward adjustment sufficient for the electricity provider to recover costs plus a reasonable rate of return. Final IDM at 17 (finding that "the GOK provided a benefit to the respondents through the provision of electricity for LTAR for certain industrial tariff classifications, the prices of which were insufficient to recover costs plus a reasonable rate of return").

The court has endorsed the reading of 19 U.S.C. § 1677(5)(E)(iv) as requiring Commerce to apply a market-determined price as a benchmark to measure the adequacy of remuneration. In *Baroque*, when explaining Commerce's obligation to determine the adequacy of remuneration in relation to prevailing market conditions, the court indicated that the proper benchmark price of the good purchased for LTAR should be "representative of the market price for the good at issue." *See Baroque Timber Indus. (Zhongshan) Co. v. United States*, 776 F. Supp. 3d 1290, 1299 (Ct. Int'l Trade 2025). Thus, the statute requires Commerce to use a market-determined price as the benchmark for measuring the adequacy of remuneration, regardless of whether the program pertains to LTAR or MTAR.

*b. By Using the Unadjusted Price at Which Electricity Was Purchased as the Benchmark to Calculate the Electricity MTAR Benefit, Commerce Unlawfully Overstated the MTAR Benefit.*

When reviewing challenges to Commerce's CVD determinations, the court has repeatedly held unlawful determinations that overstate countervailable subsidies. *See, e.g. Mosaic Co. v. United States,* 589 F. Supp. 3d 1298, 1315 (Ct. Int'l Trade 2022) (remanding the

case because Commerce may have overstated a portion of the benefit by including an additional value-added-tax ("VAT") adjustment to its tier-three benchmark that already includes VAT); *see also Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1175 (Fed. Cir. 1998) (holding Commerce's determination to countervail the full amount of export-related rebates under one program and the tax-free treatment of the rebates under a separate program constitute an unlawful overstatement of countervailable subsidies in contravention of 19 U.S.C. § 1671(a) because the full amount of the rebates subsumes any tax-free treatment of the rebates).

In this case, Commerce's calculation of the electricity for MTAR benefit based on the difference between the GOK's electricity purchase price and the GOK's unadjusted sales price for electricity is unlawful because Commerce's MTAR benefit calculation includes the below-market pricing differential that Commerce separately countervailed under the electricity for LTAR program. By comparing the GOK's electricity purchase price with its below-market selling price, Commerce measured not only the difference between the GOK's electricity purchase price and the market-determined price (*i.e.*, LTAR benchmark), but also the shortfall between the market-determined price and the GOK's electricity selling price—the price differential underlying its LTAR calculation.

More specifically, for the electricity for LTAR program Commerce calculated the percentage by which the industrial electricity rates charged to companies would need to be increased in order to permit cost recovery and a rate of return for the GOK. Final IDM at 17–22. In that context, Commerce calculated the LTAR benefit conferred to the purchasers of electricity (*e.g.*, POSCO and POSCO International) by taking the difference between the market-determined price (*i.e.*, the prices increased by the calculated percentage to allow for cost recovery and a rate of return) and the unadjusted prices actually paid. Preliminary IDM at 35;

Preliminary Calculation Mem. at 7–8. However, in the MTAR benefit calculation, Commerce used the actual, unadjusted electricity purchase price as the benchmark. Final IDM at 52; Preliminary Calculation Mem. at 8–9. This method overstated the benefit that POSCO International received for selling electricity for MTAR because Commerce already countervailed the benefit for this below-market purchase price as part of the electricity for LTAR program. *See* Preliminary Calculation Mem. at 7–8; Final Calculation Mem. at 4–5 (unchanged).

As in *Mosaic*, where the court found that Commerce failed to reasonably measure the adequacy of remuneration because the record shows that Commerce overstated the LTAR benefit by including a duplicative VAT adjustment in the benchmark, this Court should also find Commerce's determination to include the LTAR pricing differential in the MTAR benchmark unlawful. *See Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1315 (Ct. Int'l Trade 2022). As discussed, Commerce's MTAR benefit calculation overstated the benefit because Commerce calculates the MTAR benefit by comparing POSCO and POSCO International's actual electricity purchase price, which does not allow cost recovery plus a reasonable return according to Commerce's own analysis, to the price at which the GOK purchased electricity. *See IDM* at 17, 52. Commerce failed to take into account the fact that by fully countervailing the LTAR subsidy it already captured any benefit conferred to POSCO and POSCO International from purchasing electricity at a below-market-determined price. When Commerce countervails the MTAR benefit under the current benchmark, it captures an extra benefit due to its inclusion of the pricing gap between the market price and the GOK's electricity selling price. Thus, Commerce's benefit calculation for electricity for MTAR unlawfully overstated the benefit.

## *VII. Conclusion and Relief Requested*

Based on the foregoing, POSCO respectfully requests that this Court (i) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey
Xi (Jack) Yang

**TAFT STETTINIUS & HOLLISTER LLP**
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

*Counsel to Plaintiff POSCO*

*Certificate of Compliance*

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 11,343 words, including text, footnotes, and headings, and excluding the table of contents, table of authorities, and counsel's signature block, according to the word count function of Microsoft Word used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

Dated: November 23, 2026

*Certificate of Service*

Pursuant to Rule 5 of the Rules of the U.S. Court of International Trade and Administrative Order 25-01, I, Brady W. Mills, hereby certify that I served the confidential version of the foregoing Motion, Proposed Order, and Brief on the following individuals. If the recipient agreed to accept service of the foregoing submission by electronic service, such service is being effected through secure electronic means. If no agreement for electronic service has been reached, the foregoing submission is contemporaneously being served by hardcopy mail. The public version of this submission is being served through the Court's electronic filing system.

Yujin Kim McNamara
Akin, Gump, Strauss, Hauer & Feld, LLP
2001 K Street, NW.
Washington, DC 20006
(202) 887-4347
Fax: (202) 887-4288
Email: ymcnamara@akingump.com

Anna Davis Walker
U.S. Department of Justice
Commercial Litigation Branch - National Courts
Section
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 451-7729
Email: anna.d.walker@usdoj.gov

Christopher Bright Weld
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
(202) 719-4651
Fax: (202) 719-7049
Email: cweld@wiley.law

/s/ Brady W. Mills

November 23, 2026
Date